UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER PEER II,                              )
      Plaintiff,                     )
                                   )     No. 1:17-cv-72
-v-                                 )
                                   )     HON. PAUL L. MALONEY
WEST SHORE MEDICAL CENTER, ET AL.     )
      Defendants.              )
_____)

## OPINION

      This matter is before the Court on cross-motions for summary judgment on Plaintiff's claim that West Shore Medical Center deprived him of his right to due process under 42 U.S.C. § 1983.[1] Because Dr. Peer received significantly more process than was required by the constitutional "floor," and because West Shore's decision was not arbitrary or capricious, Defendants' motion will be granted and Plaintiff's motion will be denied.[2]

---

[1] At a hearing on March 29, 2019, the Court heard argument on motions for summary judgment on both Plaintiff's constitutional claim and his ADA claim. At the close of the hearing, the Court issued an opinion from the bench granting Defendants' motions for summary judgment on both strains of Plaintiff's ADA claim: (1) that Defendants violated the ADA by asking whether he was under the care of a physician as part of its application for privileges; and (2) that Defendants intentionally discriminated against him once he disclosed his bipolar disorder.

 As to the former, the Court held that asking whether a prospective physician was under the care of a doctor was a permissible inquiry as it did not tend to screen out disabled individuals and that it was necessary to ensure that the physician in question could safely treat patients. As to the intentional discrimination claim, the Court found that Plaintiff had failed to meet his burden, even assuming he had made a prima facie case of disability discrimination, because he had failed to address the Defendants' legitimate nondiscriminatory justification for the adverse actions it had taken or how that non-discriminatory justification was pretext.

[2] Summary judgment is also warranted on Count IV of Plaintiff's Amended Complaint, as the Court has previously recognized that this count, brought under the Declaratory Judgment Act, raised no independent claim for relief. (*See* PageID.3048.)

# I.

## A. Dr. Peer Joins West Shore Medical Center

Dr. Peter Peer used to be a lawyer, but now he's a radiologist. After leaving a practice in Midland, Michigan, he discovered that West Shore Medical Center (WSMC), in Manistee, Michigan was hiring and submitted a preliminary application for clinical privileges in early 2014.

A few months later, WSMC reached an agreement in principle to contract with Peer's company, Integris LLC, for part-time radiology services. WSMC prepared a contract, and Dr. Peer formally applied for privileges. In his application, Dr. Peer answered that he was not "under the care of a physician." The contract was executed, giving Dr. Peer medical privileges at WSMC for one year.

WSMC management began hearing complaints about the care rendered by Dr. Peer soon after he began. In October of 2014, WSMC's Vice President of Patient Care Services met with him to review reports written by sonography technicians raising significant concerns with Dr. Peer's care, including five specific cases where the technicians had perceived Dr. Peer to pose a risk to the safety of patients.

By March 2015, WSMC's CEO, James Barker, elected to terminate the agreement with Integris. He gave the contractually-required six-months' notice on April 7, 2015.[3] Barker says he was motivated to terminate the relationship after radiology technicians and other physicians expressed concerns over how Dr. Peer conducted certain procedures, and the general quality of his reporting.

---

[3] Much has been made of Dr. Peer's application to renew his privileges in May of 2015. He says, for example, that West Shore induced him to apply for a renewal of his privileges to continue investigating him. However, the record shows that Dr. Peer's privileges were subject to renewal in July of 2015, well before the Integris contract was scheduled to end. Therefore, he was required either to renew his privileges or provide other coverage for the radiology services that he was contractually-obligated to perform.

## B. Reports by Clinicians Lead to Peer Review Committee Investigation

While Barker was making his decision, additional complaints against Dr. Peer were referred to WSMC's Peer Review Committee (PRC). The PRC is a standing committee at WSMC, but it has no authority to discipline or otherwise act against a physician; the PRC instead reports its findings to the Medical Executive Committee, which can take further action, including initiating a formal Peer Review Action, which could lead to the loss of privileges or other sanctions.

On April 6, 2015, Dr. Kutschke put the cases involving Dr. Peer onto the agenda for the PRC's next meeting. The evidence suggests Dr. Kutschke was not aware that Barker had already decided to terminate WSMC's contract with Dr. Peer.

When the PRC met, it noted that there was no radiologist on the Committee, so the standard practice was to send the cases out for an external review. Accordingly, the PRC sent the cases referred to it—thirteen in number—to the Michigan Professional Review Organization (MPRO) to have an independent, board-certified radiologist for a blind "read-over" (meaning that the reviewing doctor would have no information regarding Plaintiff's actual reporting in those cases). Dr. Peer was notified of the external review on June 1, 2015 and the MPRO provided a report back on July 28, 2015. Ultimately, the MPRO's independent radiologist was only able to open eleven of the thirteen files because of technical issues, but his reads were "discordant" in seven of the eleven cases reviewed.

Based on the independent review and the sheer number of cases referred by clinicians—which WSMC asserts vastly outpaced that of its other practitioners—the PRC concluded that additional review of Dr. Peer's medical performance was warranted, so Dr. Kutschke met with WSMC's Medical Executive Committee to share the PRC's findings on September 3, 2015.

### C. WSMC Summarily Suspends Dr. Peer, Reinstates Him, Requests Second External Review

After hearing from Dr. Kutschke at the September 3, 2015 meeting, the MEC voted unanimously to request a temporary suspension of Dr. Peer's privileges because of the alleged risk he presented to patient safety. Dr. Barry—the Section Chief responsible for the Radiology Department—sent a formal request to Barker the same day, noting that the MEC was concerned that Dr. Peer might present an imminent risk of harm to patients.

Barker issued a letter of suspension the following day, although it was not effective until it was served on Dr. Peer four days later on September 8, 2015. The suspension was for fourteen days—the time allowed under WSMC's bylaws and federal law.

Dr. Peer then met with the MEC with his counsel, Mark Rossman on September 16, 2015 to discuss his suspension. In this meeting, Attorney Rossman disclosed for the first time that Dr. Peer had bipolar disorder and had been undergoing treatment for it when he sought privileges at West Shore.

The MEC met again five days later to discuss the status of Dr. Peer's suspension. Members of the MEC noted that the review done by the MPRO had not reached conclusions as to whether Dr. Peer had actually violated the standard of care in any of the cases reviewed. It was also noted that the Integris contract was set to expire in ten days. Therefore, the MEC recommended that the suspension not be continued. Dr. Peer was reinstated the following day.

WSMC then engaged another independent, board-certified radiologist, Dr. Richard Chesbrough, to reach an opinion on whether Dr. Peer had violated the standard of care in any of the cases referred. The MEC provided the imaging from the 13 cases submitted to MPRO, and an additional 11 cases that had been submitted to the PRC after MPRO's review for a total of 24 cases.

Dr. Chesbrough issued reports on October 12 and October 26, 2015. He concluded that Dr. Peer's performance had fallen below the standard of care in 6 of the 24 cases.

### D. WSMC Finds That Formal Peer Review Action Is Warranted

The MEC reviewed the Chesbrough Report and concluded that there was sufficient evidence to warrant initiation of a formal Peer Review Action because of Dr. Peer's alleged deviation from the standard of care. On October 28, 2015, Dr. Barry formally requested that the MEC begin a Peer Review Action under the Medical Staff Bylaws on the six cases identified by Dr. Chesbrough. Dr Barry also requested that the Executive Committee investigate: (1) Dr. Peer's failure to disclose that he was under the care of a physician for his bipolar disorder in his initial application for privileges and (2) whether he had violated the Bylaws by "failing to be free of, or have under adequate control, any significant physical mental or behavioral impairment that interest with or presents a substantial probability of interfering with patient care . . . ."

An Ad Hoc Committee was then established to investigate those subjects.[1] The Ad Hoc Committee conducted its investigation by interviewing employees within WSMC's radiology department, reviewing MPRO Report and Dr. Chesbrough's report, and the records of the PRC. The Ad Hoc Committee also allowed Dr. Peer to submit anything he wished, and he exercised his right by submitting voluminous documentation.

The Ad Hoc Committee also intended to interview Dr. Peer. At one point, it agreed to allow him to respond to written questions instead of a live interview but later backtracked and insisted on a live interview. Dr. Peer then decided that he would not interview without his counsel present, but West Shore rejected this condition. No interview ever took place.

---

[1] Under WSMC's Bylaws, when the requester of a Peer Review Action would sit on the committee, it must instead be referred to an Ad Hoc Committee of physicians at the hospital who did not have any conflict of interest. Therefore, since Dr. Barry was both a member of the MEC and the requester of the Peer Review Action, the Bylaws required the creation of the Ad Hoc Committee.

### E. MEC Recommends Adverse Action based on Ad Hoc Committee Findings, Plaintiff Appeals to Independent Hearing Officer

The Ad Hoc Committee issued a report on January 8, 2016, finding by a unanimous vote that Dr. Peer had violated the standard of care in each of the six incidents referred to it. The Ad Hoc Committee also concluded that Dr. Peer had violated WMSC's Bylaws by failing to disclose that he was under treatment by a physician for his bipolar disorder at the time he applied for medical privileges with WSMC and by "failing to be free of" his bipolar disorder.

The MEC met on February 16 and March 4, 2016 to consider the Ad Hoc Committee report. During the second meeting, the MEC held a video conference call with Dr. Chesbrough, where members of the MEC questioned the basis for his opinions as to Dr. Peer's medical care in the pertinent cases.

At the conclusion of the meeting, the MEC voted unanimously to recommend to the Board of Trustees that Dr. Peer's pending application for renewed staff privileges be approved, contingent upon him completing 90 days of proctoring by an independent, board-certified radiologist. The MEC also recommended a one-level reduction in Dr. Peers rank—from Associate to Affiliate—for his failure to disclose that he was currently under the care of a physician. (The Application for Privileges that Dr. Peer signed warned that the failure to disclose any information requested could result in a reduction in rank.) Importantly, the MEC took no action on the Ad Hoc Committee's finding that Dr. Peer had "failed to be free of" his bipolar disorder. No adverse action was ever taken on this finding.

The MEC notified Dr. Peer of its recommendations and explained his right to request a hearing before an independent hearing officer in accordance with federal law and Article XIV of the Medical Staff Bylaws. Dr. Peer did so.

### F. Independent Hearing Officer Conducts Hearing, Agrees with the MEC

WSMC selected Warner Norcross Judd attorney Alan Rogalski to act as the hearing officer after finding that he was qualified and had no conflict of interest. Rogalski performed his own conflict check and accepted the offer. Dr. Peer has never objected to Rogalski serving as the hearing officer, although his due process argument relies in part on a theory that Rogalski "rubber-stamped" the findings by the Ad Hoc Committee and MEC.

Dr. Peer, WSMC, and Rogalski held a pre-hearing conference on April 19 to address procedural and structural elements of the impending hearing, which was set for July but later rescheduled for September upon request by Dr. Peer. During this time, the parties engaged in discovery including the exchange of documents and taking of depositions.

The hearing was eventually held from September 12–14, 2016. Dr. Peer was represented by his counsel, Mark Rossman. WSMC called Drs. Barry, Chesbrough, Joanette, and Kutschke. Plaintiff called his expert, Dr. Bude, and testified on his own behalf. The parties also stipulated to the admission of six exhibits including the documents evaluated in the Peer Review, the diagnostic images Chesbrough had reviewed, and the WSMC bylaws. Plaintiff submitted fourteen additional exhibits including his CV and other credential-based records, as well as Dr. Bude's CV and Bude's opinions with respect to the six patients at issue. The hearing was also transcribed by a court reporter. After the hearing, the parties submitted post-hearing briefs and cross-replies in November 2016.

Rogalski issued a 63-page Decision and Recommendation on January 3, 2017. He began with a review of the facts and circumstances leading up to the hearing, and then proceeded to thoroughly summarize the evidence as to each of the six patients for whom Dr. Peer was alleged to have fallen below the standard of care. In each case, Rogalski considered the report of Dr. Chesbrough, the report of the MPRO radiologist (where applicable), and the live testimony. Rogalski found that the evidence supported the MEC's determination that, in all six cases, Dr. Peer had fallen

below the standard of care and that the evidence demonstrated that Plaintiff's lapse adversely affected or could have adversely affected the health and welfare of each patient.

Rogalski also reviewed the circumstances of Dr. Peer's non-disclosure of his bipolar disorder. Dr. Peer apparently argued in his post-trial brief that he was not required to disclose as he was not "under the care of a physician" because a nurse practitioner would write his prescriptions. Rogalski found the argument contradicted by Dr. Peer's own testimony that he was seen by a physician for an annual exam related to his bipolar disorder. Rogalski concluded that Dr. Peer had an obligation under the Medical Bylaws to disclose his condition, and that he had "opened the door" to questions about his condition, treatment, and any possible interference with his ability to practice by his late disclosure to the MEC.

A little more than two weeks after Rogalski issued his report, West Shore's Board of Trustees voted unanimously to adopt the Medical Executive Committee's recommendations. Accordingly, West Shore reported to the National Practitioner Data Bank that:

> [Dr. Peer] was found to have violated the standard of care for radiologists in six cases and failing to disclose a psychological/mental impairment on his initial application for privileges. As a result, the Board of Trustees imposed a mandatory proctoring program for a 90-day period and reduced his staff category by one level until his next bi-annual reappointment.

Very shortly thereafter, this litigation commenced.

## II.

The matter is now before the Court on cross-motions for summary judgment.

The standards upon which the Court evaluates motions for summary judgment does not change where "both parties seek to resolve [the] case through the vehicle of cross-motions for summary judgment." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991). Therefore, granting either Dr. Peer's motion or West Shore's motion is appropriate "only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show

there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). The question, then, is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that [the moving] party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252; *see, e.g., Resolution Trust Corp. v. Myers*, 9 F.3d 1548 (6th Cir. 1993) (citing *Anderson,* 477 U.S. at 249) (noting the function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").

Where the moving party also has the burden of proof, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). In other words, the party with the burden of proof "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). Therefore, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## III.

### A. The Law of Due Process[5]

---

[5] Many of Plaintiff's constitutional claims fall under the rubric of substantive due process rather than procedural due process. The Court will analyze such claims under both frameworks despite Plaintiff having not pleaded any violation of his substantive due process rights because of the substantial overlap between such claims in practice.

1. Procedural Due Process

The Due Process Clause of the Fourteenth Amendment provides that "no State shall ... deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV.

For a procedural due process claim under the Fourteenth Amendment to succeed, a plaintiff must first establish the existence of a liberty or property interest of which the defendant deprived him. *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 82 (1978). The plaintiff must then demonstrate that the defendant deprived him of that interest without due process of law. *Id.* at 84. Most importantly, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

However, the overall concept of due process of law is a flexible one, and therefore the type of procedural protections required in a particular situation depends largely upon the circumstances of that situation. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). *Matthews* instructs that with regard to procedural due process claims, courts must evaluate (1) the nature of the private interest to be affected, (2) the risk of an erroneous deprivation of such interest through the procedures used and the value of any additional or substitute procedural safeguards, and (3) the government's interest, including in the added burden imposed by additional procedural requirements. 424 U.S. at 335.

The Sixth Circuit has explained that "[a] federal court's review of disciplinary actions taken against a physician by a hospital is generally limited to determining whether the procedures used violated any federal rights and whether the administrative body was presented with substantial evidence to support its ultimate action." *Yashon v. Hunt*, 825 F.2d 1016, 1022 (6th Cir. 1987), *cert denied,* 486 U.S. 1032 (1988). In such cases, the Court must afford "great deference" to the hpsital's governing body concerning the administration of medical privileges; it does not review the merits of

the underlying charges. *Id.* (citing *Lew v. Kona Hosp.*, 754 F.2d 1420, 1425 (9th Cir. 1985); *Laje V. R.E. Thomason Gen. Hosp.*, 564 F.2d 1159, 1162 (5th Cir. 1977).

In *Yashon*, the Sixth Circuit balanced the *Matthews* factors and recognized the competing interests between the physician-plaintiff's interests in being reappointed Ohio State University's medical staff and avoiding damage to his reputation and/or income, and the University's interest in retaining only competent and compatible physicians. The court also noted that hospitals have "an important interest in quickly dealing with incompetence and debilitating personal frictions," in order to ensure "[e]ffective performance by physicians on the staff ... whose tasks require a high degree of cooperation, concentration, creativity, and the constant exercise of professional judgment." *Id.* at 1023 (internal quotations omitted).

The court then addressed several procedural safeguards that Plaintiff claimed to have been deprived of in violation of his procedural due process rights. Ultimately, the court concluded that in the context of medical staff privileging disputes, <u>due process did not require</u>: (1)  allowing the physician to call witnesses, (2) issuance of a written opinion regarding the bases for a decision denying privileges, (3) adoption of specific standards to guide the decision so long as the evidence relied upon was reasonably related to the operation of the hospital and its medical staff, (4) a detailed written statement of the reasons a denial of privileges is being considered; (5) pre-hearing discovery, or (6) that the physician be afforded the assistance of counsel. *Id* at 1023–26.

<u>2. Substantive Due Process</u>

The interests protected by substantive due process are much narrower than those protected by procedural due process. In the medical privilege context, a hospital may withstand substantive due process scrutiny, so long as its decision is "untainted by irrelevant considerations and [is] supported by substantial evidence to free it from arbitrariness, capriciousness, or unreasonableness." *Yashon*, 825 F.2d at 1027 (citing *Woodbury v. McKinnon*, 447 F.2d 839 (5th Cir. 1971). The

*Yashon* court determined that because defendants presented "substantial relevant evidence" supporting its decision to deny plaintiff's application for reappointment to the medical staff, they had not violated plaintiff's substantive due process rights. *Id.*

## B. Application

Applying the foregoing principles to Dr. Peer, the Court must first ascertain what property interest, if any, Defendants are alleged to have taken from him. The Board of Trustees acted in three ways. It approved his renewal of privileges contingent on a 90-day proctoring arrangement with an independent radiologist (at Dr. Peer's expense). It also demoted Dr. Peer from Associate to Affiliate. Finally, under federal law, both of these punishments were reportable events, so West Shore filed a report with the NPDB indicating each of the adverse actions. Therefore, Plaintiff's property interest at issue in this case is limited; this is *not* a case in which a physician is denied privileges or has his privileges terminated.

While it is arguable whether or not Defendants deprived Plaintiff of a property interest by conditioning the renewal of privileges on a proctoring arrangement, it is undisputed that his reduction in rank constitutes the deprivation of a property interest. Thus, the Court will turn to the specific ways in which Plaintiff believes West Shore violated his due process rights.

### 1. Arbitrary Standards

First, Plaintiff claims that Defendants "egregiously failed to maintain or apply clear, written standards" for assessing his performance as a radiologist and for triggering peer review action. He says that there were no written standards to measure his performance.

West Shore's Bylaws set the pertinent standard, but it should be immediately familiar to any physician (or any lawyer who works in the area of medical malpractice). Article XIII(1)(b) of the Bylaws provide that Peer Review Action of Dr. Peer could be initiated where his competence or professional conduct was called into question because he failed "to provide the recognized standard

of care within [his] specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances."

Every radiologist to have testified in the administrative proceedings and in this litigation has readily recognized that the standard of care for a radiologist is: "what would a reasonably prudent radiologist do in like or similar circumstances?" In other words, West Shore's Bylaws allow for formal Peer Review Action where one of its practitioners is suspected to have committed malpractice. *See generally* MI Civ. JI 30.01, Professional Negligence/Malpractice.[6]

Dr. Peer claims that the standard of care promulgated in the Bylaws is "vague and arbitrary," comparing it to a hospital bylaw that allowed for a physician's privileges to be reduced if it would be "in the best interest of the hospital and its patients." *Milford v. People's Community Hospital Authority*, 380 Mich. 49, 62 (1968).

*Milford* is obviously distinguishable. Radiologists understand that they must act as an objectively reasonable radiologist of ordinary experience, skill, and training; they cannot possibly conform their conduct to whatever would be "in the best interest of the hospital and its patients." *See id.* ("The bylaws in question provide no qualifications which the staff physician must possess, *provide no standard of knowledge or skill*, nor do they make any provision as to the character or conduct of the physician."). Accordingly, the Court concludes that, as a matter of law, West Shore did not apply an arbitrary and capricious standard to initiate the Peer Review Action against Dr. Peer.

---

[6] The instruction reads: "Professional negligence and malpractice are the same. They mean the failure to do something that a [ name profession ] of ordinary learning, judgment and skill in [ this community or a similar one / [ name particular specialty ] ] would do, under the same or similar circumstances as in this case. Professional negligence, or malpractice, can also mean doing something that a [ name profession / name particular specialty ] of ordinary learning, judgment and skill would not do, under the same or similar circumstances as in this case."

## 2. "West Shore's PRC Forms Were Predicated on Standards that were Arbitrary as a Matter of Law"

Plaintiff's next theory is that the PRC's "initial Provider Review Forms"—the referrals that led to the assessment by the Peer Review Committee—violated his right to due process. He argues that "the very basis upon which Dr. Peer's cases were initially referred to the PRC – as reflected on the face of these 'Initial Provider Review Forms' – was arbitrary, vague, and undefined."

This claim has no basis in law. The Sixth Circuit concluded in *Benjamin v. Brachman* that arguments that a physician "did not receive procedural due process in the committee reviews and meetings leading up to the [formal hearing with the final decision-making body] *need not be evaluated*," as "[t]he Constitution does not require notice of an investigation that might ultimately lead to the deprivation of a property interest." 246 F. App'x 905, 915 (6th Cir. 2007) (emphasis added) (citing *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 524-25 (10th Cir. 1998). Therefore, because the Peer Review Committee only undertook an "an investigation that might ultimately lead to the deprivation of a property interest[,]" no claims lies here. *Id.*

## 3. West Shore Did Not Calculate Dr. Peer's Discrepancy Rate

Plaintiff asserts that WSMC failed to calculate Plaintiff's overall discrepancy rate to assess his performance as a radiologist. He asserts that WSMC "cherry-picked" cases where Dr. Peer had allegedly rendered substandard reads, and used only those cases to punish him, even though he had done nearly 18,000 reads while working at WSMC. He says that "[p]erfection cannot be the standard in peer review, and, if West Shore's standard of care ignores discrepancy rates, then every practitioner at West Shore could be sanctioned and reported to the NPDB for every mistake they make." The gist of the argument is that that no matter how far below the standard of care a radiologist falls in any single case, it cannot provide the basis for disciplinary proceedings.

Dr. Peer's theory is essentially that WSMC was constitutionally-obligated to select a random sample of at least several hundred cases for an independent analysis, and that it could only take adverse action against him for violating the standard of care his error rate was above other radiologists on the staff or nationally-accepted error rates. Plaintiff's expert professes this opinion in great detail. She asserts that more than half of the radiologists in the United States use one particular method of statistical analysis called RadPeer.

Certainly, a large-scale statistical analysis is one method of peer review. But Dr. Peer raised this theory at every level of the administrative proceedings, and none of the fact finders accepted it. Rogalski addressed this argument is great detail and wrote that Dr. Peer's error rate was not relevant. He explained that the *only* questions at issue in the matter were whether Dr. Peer had breached the standard of care in each of the six identified cases, whether his professional conduct was such that it adversely affected or could affect adversely patient care in those cases, and whether he violated the hospital bylaws by failing to disclose relevant information in his Application for Appointment.

Dr. Peer's disagreement does not amount to a constitutional injury under either the substantive or procedural due process frameworks. No reasonable juror could conclude that Plaintiff was deprived of a meaningful opportunity to be heard on this issue. He presented expert testimony to the Independent Hearing Officer supporting his theory that WSMC should have conducted a statistical analysis, and Hearing Officer issued a reasoned decision concluding that Peer's error rate was irrelevant to whether he had breached the standard of care.

Nor could a reasonable juror find that the process used by WSMC to establish that Dr. Peer violated the standard of care shocked the conscience. *See, e.g., Benjamin,* 246 F. App'x at 918 ("Plaintiff's argument that the revocation of his medical privileges and the subsequent report to the NPDB were conscience-shocking goes against the weight of the record, which shows that an extensive

evaluation was undertaken to determine whether Plaintiff's medical privileges should be revoked based on his level of clinical competency.").

While the RadPeer method may be an acceptable method of peer review, Dr. Peer had no constitutional right to have his peer review conducted under any particular method, so long as the process was not arbitrary and capricious. *Id.* There is nothing arbitrary or capricious about having expert witnesses offer their opinions on whether or not reasonable radiologists would have come to the same conclusions that Dr. Peer did, and then having an independent fact-finder issue a decision on that basis.

#### 4. Conflicts of Interest

Dr. Peer also claims that physicians on the staff at West Shore who had filed complaints against him were allowed to participate on the committees that evaluated the care he provided. He specifically notes that Drs. Barry, Kutschke, and Joanette had "complained, criticized or expressed concern or disagreement with his work" prior to sitting on the committees.[7]

"[D]ue process is not met where the adjudicator has been the target of abuse or criticism from the person he is to evaluate, and where the adjudicator has a pecuniary interest in the outcome." *Benjamin*, 246 F. App'x at 917 (citing *Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975).

Here, for the reasons previously stated, the PRC is not an "adjudicator," as it took no adverse action against Dr. Peer and had no authority to do so, so any alleged conflict as to Dr. Kutschke is inconsequential. *See supra* III.B.2.

---

[7] Plaintiff's basis for claiming basis is an answer to an interrogatory in this litigation, where he had requested names of "all colleagues, supervisors, administrators, patients, and other who ever complained about or criticized" him or his work at West Shore. However, the interrogatory lacked any temporal limitation, and it is not clear from the record how or when the individuals mentioned above criticized Dr. Peer. Importantly, it is unclear whether their criticism came before or after the Peer Review Action. Dr. Peer has produced no other evidence of any conflict of interest.

However, even the alleged bias of Dr. Barry and Dr. Joanette is insufficient to create a genuine dispute of fact for trial. First, Plaintiff has offered no evidence of bias other than West Shore's answer to his interrogatory, and he has not offered any theory to explain how either doctor had a pecuniary interest in the outcome of the Peer Review Action. Moreover, Dr. Joanette was insulated from the final action by three additional levels of review. Dr. Barry was insulated from the final action by two levels of review. Plaintiff has not attempted to show that either Rogalski or the Board of Trustees had any conflict of interest. Therefore, Plaintiff has not generated sufficient evidence to create a genuine dispute of fact for trial on his theory that he was deprived of procedural due process because of any alleged conflict of interest.

### 5. "Defendants Arbitrarily Failed to Complete Their Own PRC Forms"

Plaintiff next reprises his earlier argument that the informal review by the PRC violated his right to due process. This is not an actionable due process claim, as previously explained.

### 6. "Defendants' Own External Reviewers Contradicted Each Other"

Plaintiff says that one the "starkest examples" of the arbitrary nature of the peer review process is that the MPRO's radiologist and Dr. Chesbrough disagreed with each other. Specifically, the MPRO radiologist indicated that he disagreed with 7 of the 11 reads by Dr. Peer. Chesbrough wrote that 5 of the 7 reads were either "minor disagreements" or "typographical issues."

This is unpersuasive because the two external reviewers were given different tasks. The MPRO was asked only for a blind read, which was found discordant with Dr. Peer's read in 7 of 11 cases. It is inconsequential that Dr. Chesbrough later decided that 5 of the 7 divergent reads were minor disagreements; the MPRO never represented how big or small the difference of opinion was, instead noting only when its read was different than Dr. Peer's. Significantly, only two of the files reviewed by the MPRO were actually referred as part of the Peer Review Action that led to the adverse action. Those were the two cases that Chesbrough found were <u>not</u> minor disagreements.

(The other four cases at issue in the Peer Review Action were not submitted to the MPRO because they had not yet been received.) Accordingly, this theory cannot support a claim that Dr. Peer was deprived of due process.

### "7. Defendants Failed to Involve Dr. Peer in the Process, which was Not Collaborative or Educational But Only Punitive"

Plaintiff asserts that his due process rights were violated because, in his view, the peer review process was not collaborative. This is an unconventional argument; the Court has discerned no case law for the proposition that a physician has a constitutional right to "collaborative" or "educational" peer review. Therefore, as a general matter, this kind of unsupported and conclusory theory is not viable at the summary judgment phase.

However, Plaintiff does make a specific claim that his right to due process was violated because the Ad Hoc Committee did not interview him, as the Bylaws required. As the Court noted in its statement of facts, West Shore requested an interview, but after some haggling over terms, Dr. Peer refused to sit for an interview without his counsel present.

In essence then, the argument is that West Shore was constitutionally required to allow Dr. Peer access to his counsel during the informal interview. Not so; if Dr. Yashon did not have a right to counsel at the *formal* hearing regarding his medical privileges, 825 F.2d at 1026, then neither did Dr. Peer have a right to counsel during the *informal* interview with the Ad Hoc Committee.

### 8. "Defendants Arbitrarily Suspended Dr. Peer's Privileges

This claim centers on the 14-day summary suspension issued by West Shore's CEO, James Barker. Plaintiff claims that the suspension was arbitrary because WSMC could not find, based on the MPRO report, that he posed a risk of imminent danger to the hospital's patients.

Defendants respond that the summary suspension was authorized by the HCQIA and analogize to the issuance of a temporary restraining order under the Federal Rules of Civil

Procedure. West Shore says that the process worked as it was intended: It made an initial finding that, based on the MPRO Radiologist's finding of 7 of 11 discordant reads, there was a risk to patient care. But after Dr. Peer could be heard on the issue, the MEC reversed its determination and allowed the summary suspension to lapse.

In the Court's view, Dr. Peer's claim premised on the summary suspension fails under either the procedural or substantive due process frameworks.

First, if framed as a substantive due process claim, Dr. Peer's theory must fail because he is asking the Court to substitute its judgment for that of the MEC and to apply the benefit of hindsight to the hospital's decision-making. Said differently, substantial evidence supported West Shore's decision to issue a summary suspension because an external reviewer came to different conclusions in seven of eleven cases reviewed and one of those cases was a failure to diagnose a broken neck. *Yashon*, 825 F.2d at 1027; *McMillan v. Anchorage Comm. Hosp.*, 646 P.2d 857 ("[S]ummary suspension of [physician's] privileges is justified only where there is evidence that a physician's conduct poses a realistic or recognizable threat to patient care which would require immediate action by the hospital.").

Alternatively, if Plaintiff is pursuing a procedural due process claim, it must fail because he has not argued that he was entitled to a pre-suspension hearing, or that the hearing he received after the suspension issued was inadequate. *See, e.g.*, *Murphy v. St. Agnes Hosp.*, 484 N.Y.S.2d 40 (N.Y. App. Div. 2d 1985) (holding that Board of Trustees violated due process by deviating from bylaw-mandated processes in issuing summary suspension).

9. "Defendants Failed to Reasonably Investigate the Allegedly Substandard Cases"

Plaintiff argues that West Shore did not thoroughly investigate the six cases in which he was found to violate the standard of care. But there is no real dispute that he received an opportunity to be heard at a meaningful time and place on this issue: He presented all of these critiques of West

Shore's investigation to Rogalski. Thus, there can be no procedural due process claim on this theory. To the extent that Plaintiff's claim is for substantive due process, any reasonable juror would conclude that the adverse actions taken by West Shore were supported by substantial evidence.

10. "Defendants Failed to Conduct Any Investigation Whatsoever into Dr. Peer's Self-Disclosed Bipolar Disorder"

Now veering into ADA territory, Plaintiff inexplicably argues that West Shore failed to investigate the extent or severity of his bipolar disorder, and that this failure violated his right to due process. But as previously mentioned, neither of the adverse actions taken by West Shore had anything to do with Plaintiff *having* bipolar disorder. The proctoring arrangement was a direct response to the finding that he violated the standard of care in six cases; the reduction is rank was a direct response to his failure to *disclose* his bipolar disorder.

While the Court has noted that Dr. Barry wrote that the Peer Review Action would include an investigation into whether Dr. Peer "remained free of" his bipolar disorder, and the Ad Hoc Committee made an adverse finding in that respect, this portion of the investigation was never continued. The record is clear that the only two issues before Rogalski were the adverse actions noted above, and the Board of Trustee adopted Rogalski's findings as to those actions.

Plaintiff makes much ado of the NPDB report, which stated that he had been disciplined for "failing to disclose a psychological/mental impairment on his initial application for privileges." He says that the word choice—i.e. "impairment"—leads to an inference that Dr. Peer's condition impacted his ability to practice medicine and thus caused him reputational harm.

Plaintiff has offered no caselaw for the proposition that the subjective connotations of words used in NPDB reports can give rise to a claim for deprivation of procedural or substantive due process. Thus, the Court does not view this theory to be viable as a matter of law. *Cf. Benjamin*, 246

F. App'x at 919 (6th Cir. 2007) (rejecting argument that NPDB report labeling physician "incompetent" violated substantive due process).

11. "Defendants' Punishment Was Unfair and Arbitrary, as West Shore Had Already Terminated His Contract"

Plaintiff also argues that he should not have been subjected to any adverse action by West Shore because his contract had already expired. However, as West Shore has explained, it is an "open" hospital, meaning that Dr. Peer could continue to treat patients at the hospital regardless of whether he was under contract. Therefore, the hospital obviously had an interest in coming to a reasoned resolution on whether Dr. Peer had followed its Bylaws and met the standard of care in treating patients. There is no authority to suggest that West Shore was required to drop any investigation into Dr. Peer simply because his contract had expired, or that West Shore's continued investigation somehow violated Dr. Peer's right to due process. Accordingly, this claim fails.

12. "The Various Due Process Violations Made a Fair Hearing Impossible"

Plaintiff's last attempt at a constitutional claim is an assertion that the "litany" of due process violations made it impossible for him to receive a fair hearing. Having found no due process violation to speak of, this cumulative claim must also fail. Plaintiff cannot transmute his dissatisfaction with the outcome of the peer review action into a constitutional claim merely by invoking the words "unfair" and "arbitrary."

**IV.**

West Shore Medical Center engaged in a protracted, painstaking review of complaints that arose out of Dr. Peer's job performance as its Bylaws required. It provided him with every procedural safeguard mandated by the Constitution, and then more.

Because of those procedural protections, Dr. Peer had ample notice of the allegations against him and was able to vigorously contest the hospital's findings. With the assistance of his counsel, he

made his case in front of a neutral hearing officer during a three-day proceeding that bore nearly all of the hallmarks of a judicial trial. The hearing officer did not agree with Dr. Peer, however, and issued an extensive written opinion detailing his findings and conclusions. Based upon that independent hearing officer's conclusions, West Shore took adverse action against Dr. Peer.

Under these circumstances, Dr. Peer has not shown that his substantive due process rights or procedural due process rights were violated. The Due Process Clause provides powerful protections to the people of the United States, but it does not include the guarantee of a particular outcome—no matter how strenuously Dr. Peer argues to the contrary.

## ORDER

For the reasons explained in the accompanying opinion, Defendants' motion for summary judgment is **GRANTED**, and Plaintiff's motion for summary judgment is **DENIED**.

Judgment to follow.

**IT IS SO ORDERED.**

Date:   April 4, 2019              /s/ Paul L. Maloney
                                                     Paul L. Maloney
                                                     United States District Judge